Eugene PFEIFER III *v.* E. F. DUNN et al

74-310                           520 S.W. 2d 718

Opinion delivered March 24, 1975

*Eichenbaum, Scott, Miller, Crockett and Darr,* by: *James E. Darr Jr.,* for appellant.

*Rose, Nash, Williamson, Carroll & Clay, P.A.* and *Catlett & Henderson,* for appellees.

LYLE BROWN, Justice. The plaintiff and intervenors, E. F. Dunn and the trustees of the Kinkead estate sought and were granted a private easement for the uninterrupted use of a road crossing defendant's property. The road then ran north across plaintiff's property, thence north across the property of the Kinkead (trustee) estate. Appellant Eugene Pfeifer III contends the appellees' use of the property was at all times permissive and did not ripen into an easement.

The essential facts are substantially undisputed. The setting of the farm lands to which access is involved is along the Arkansas River near the rural community of Natural Steps. The latter community is on high ground and a number of farmers cultivating the lands adjacent to the river live at Natural Steps.

There is an all-weather road running north along the river bank and serving from south to north, the Pfeifer acreage, then the Dunn acreage, then the Kinkead acreage. The road has an interesting history. A county road and bridge which for years had served the farms washed into the river. In 1963 the United States Engineers built an all-weather road along the river bank to gain access to a bank stabilization program. That road adjoins, in fact runs through the edges of, all the litigants' properties. The government moved out in 1964. Dunn, the Kinkeads and some six other farmers on the north end of the road continued to use the road as farm access. Immediately the farmers were faced with a multitude of problems. The new road, the stabilized banks and other improvements attracted fishermen, picnickers, vandals and party groups. Serious vandalism was committed to farm equipment left in the fields overnight. To combat the undesirables, E. L. Kinkead, on the road just south of the Olive Moreland property, erected a gate which was locked. Keys were furnished all the land owners and their tenants. That was in 1964. Not many months thereafter the gate was moved approximately 100 feet north along the road and erected on the land of Olive Moreland, to which action Miss Moreland had no objection. A culvert installed by the

government contractors under the road where it was crossed by Mill Bayou was inadequate and a wider one was placed and maintained by Pulaski County. The entire road has since its inception been maintained by Pulaski County with the knowledge of all affected landowners. The maintenance foreman of Pulaski County was furnished with a key to the gate.

In the spring of 1973, appellant Eugene Pfeifer III, became the successor in title to Miss Olive Moreland relative to the land upon which the gate was located. Mr. Pfeifer, on June 25, 1973, changed the lock on the gate for which appellee and others using the road possessed a key. Of course the effect of the changing of the lock was to preclude ingress and egress by parties other than Mr. Pfeifer.

On July 26, 1973, appellee E. F. Dunn instituted suit, praying that appellant Pfeifer be ordered to open and leave open the above mentioned gate and permit the appellee, his tenants and employees free and uninterrupted use of the road across the land of appellant. The trustees of the Kinkead estate did on the same day file an intervention praying for practically the same relief as sought by appellee Dunn. At a preliminary hearing the court granted a temporary injunction enjoining Pfeifer from denying appellees the use of the road. Pfeifer was ordered to make available keys to the gate to appellees and all other persons and their agents and employees who had previously utilized the gate and roadway and ordered appellant to permit those individuals free and uninterrupted use of the roadway. On December 14, 1973, at a hearing on the merits, the court decreed that the temporary injunction should be made permanent.

In upholding the final order of the court, we repeat, in order to avoid any misunderstanding of our ruling, the court's finding:

The temporary order of this court entered on July 31, 1973, shall be and the same hereby is made permanent and the defendant be and he hereby is ordered to make available to the plaintiff and the intervenors keys to any lock he has placed or will place on the gate at the

southern boundary of the servient estate, and is further ordered to permit free and uninterrupted use of the roadway across the servient estate as has been made of said roadway in the past, by the plaintiff, intervenors, their agents, and employees, and the beneficiaries of Ewing L. Kinkead Trust No. 1, and Ewing L. Kinkead Trust No. 2.

We have inserted the finding of the court in order to make certain of no misunderstanding. In upholding the trial court we are not deciding that the public has acquired an easement across said road; therefore the substantial body of our law applying to public easements has no application as respects the case at hand.

There are several factors which, when combined, lead us to the conclusion that the court acted properly in sustaining the private easement. First, although it might be said there was an element of permissiveness in Miss Moreland's allowing the construction of the gate near the entrance to her land, it was a common gate for a common purpose, namely, to protect against vandalism.

In the case of *Fullenwider* v. *Kitchens*, 223 Ark. 442, 266 S.W. 2d 281 (1954), there was no consideration for the use of the passageway. Consequently, the use of the passageway originated strictly as a permissive right. We point up that distinction in *Fullenwider* because we think it is important to our holding. As just pointed out, it was for the common good of all the landowners to have a common gate to protect against vandalism. Also, it can be said that the new road served as a substitute for a county road which had been washed into the river. The fact that the road had been kept in good condition and the maintenance performed by county employees should have placed any doubtful property owner upon inquiry. All that has been done, including the erection of the gate, the distribution of keys, and the upkeep of the road, would serve to notify any interested person that the common property owners were recognizing a right to a common road, being a private easement.

Affirmed.